QUEENER *et al. v.* MAGNET MILLS, INC., *et al.*

(*Knoxville,* September Term, 1942.)

Opinion filed December 5, 1942.

418

HAMMOND FOWLER, of Rockwood, and CHARLES G. NEESE, of Paris, Tennessee, for appellant Commissioner of Labor.

LADD & CARSON, of Clinton, for appellee Queener et al.

T. A. WRIGHT, JR., of Knoxville, for appellee Magnet Mills.

MR. CHIEF JUSTICE GREEN delivered the opinion of the Court.

The controversy here presented to the Court arises out of an effort by certain employees of Magnet Mills, Inc., to obtain unemployment compensation to which they contend they are entitled under chapter 1 of the Acts of the First Extra Session of the Legislature in 1936, section 6901.1 et seq., Williams' Code, section 6901(1) et seq., Michie's Code. Their claims were regularly presented according to the provisions of that Act and reached the Board of Review. That tribunal affirmed a ruling of the Commissioner of Labor denying the claims and the employees brought the case before the Chancery Court of Anderson County by a petition for *certiorari*. The chancellor reversed the order of the Board of Review

and decreed in favor of the employees. The petition for *certiorari* made Magnet Mills, Inc., and the Commissioner of Labor defendants. The former acquiesced in the chancellor's decree but the Commissioner has appealed to this Court and assigned errors.

■ The employees made a motion to dismiss the appeal on the ground that the Commissioner of Labor had no interest in the matter. This motion must be overruled. The Commissioner was made a party defendant by the petition for *certiorari* and by section 6(h) of the Unemployment Compensation Act he is deemed a party to any such proceedings as this. Furthermore, under section 9 of the Act the Commissioner administers the unemployment compensation fund and is a trustee thereof.

There is no controversy as to the facts of the case. These are developed in the testimony of T. A. Wright, vice president of the Mills, and in a stipulation entered into between Wright and the attorneys for the claimants.

Wright testified that about September 1, 1941, it was necessary for the Company to start operating on a part-time basis so as to get the maximum compensation for the employees and that operations were accordingly begun on a staggered system. That on Monday, September 8, the president of the American Federation of Hosiery Workers, Branch 125, informed him (Wright) that a strike was going to be called on the next day, September 9, and that picket lines would be thrown around the plant.

According to Wright, on September 9, 10, 11, and 12 there was more or less violent picketing about the Mills. On September 10 the management met with a committee representing the American Federation of Hosiery Workers at which time the latter made a demand for a union contract, a fifteen per cent wage increase, and a week's

vacation with pay. The witness said that the claimants in the present suit all worked for one or more of the days September 9, 10, 11, and 12.

Further testifying, Wright said that on September 12 Mills officials were advised by the sheriff of Anderson County that to avoid possible bloodshed and fighting, and perhaps rioting, he had agreed with an organizer of the United Mine Workers of America that if they would allow employees to go into work that morning without physical violence he would withdraw police protection from the plant on Monday the 15th and Tuesday the 16th. The plant management then called the employees who were working, advised them of the situation, and told them the plant would not open on September 15 and September 16 or until adequate law enforcement could be procured so as not to endanger their lives. On September 16 an agreement was worked out between the Union representatives and the Mills management that an election would be held to determine the bargaining agency for the employees and as part of that agreement it was stipulated that the Mills should be closed until the election was held. The election was held on October 3, 1941, and the vote was 337 for Union representation and 525 against such representation. Thereafter the Mills opened on Tuesday, October 7, 1941. Wright said that with the exception of the departments designated as winders and reclaim-waste, which departments had three employees each, there were one or more employees on strike from every other department of the Mills. He further said that there were some twenty-eight departments in the Mills.

The stipulation of facts set out that all the claimants herein were eligible for benefits unless disqualified under the unemployment compensation law. That each and every claimant worked on one or more of the days Sep-

tember 9, 10, 11, or 12, 1941. That "no employee of this class was participating in, or directly interested in, any labor dispute, if any existed." That there was no labor dispute between the Magnet Mills, Inc., and any particular grade, class or craft. The stipulation contains other matters not material just here or covered in the testimony of Wright.

Section 5 of chapter 1 of the Acts of the First Extra Session of 1936, as amended by Pub. Acts 1939, ch. 131, section 8, enumerates certain things which shall disqualify the unemployed from benefits. Among other disqualifications is the following and the exception thereto:

"(d) For any week with respect to which the commissioner finds that his total or partial unemployment is due to a labor dispute which is in active progress at the factory, establishment, or other premises at which he is or was last employed, provided, that this subsection shall not apply if it is shown to the satisfaction of the commissioner that—

"(1) He is not participating in or directly interested in the labor dispute which caused his total or partial unemployment; and

"(2) He does not belong to a grade or class of workers of which, immediately before the commencement of the labor dispute, there were members employed at the premises at which the labor dispute occurs, any of whom are participating in or directly interested in the dispute."

The Board of Review found that the unemployment of the claimants was due to a labor dispute in progress at the Mills and that claimants did not bring themselves within the exception of (1) and (2) of (d) above quoted. It was stipulated, as above stated, that claimants were not participating in or directly interested in the labor dispute but the Board of Review found that all of the

claimants belonged to some grade or class of workers, one or more of which class or grade was participating in or directly interested in the dispute.

The chancellor found that the unemployment of the claimants was not due to a labor dispute within the meaning of the statute but was due to the withdrawal of police protection and the subsequent closing of the Mills.

We do not think it necessary to decide whether the unemployment of claimants was due to a labor dispute in the case before us. If a labor dispute existed in the sense of the statute, in our opinion claimants bring themselves within the exception to the disqualification set out in (d) (1) and (d) (2).

The record does not show in what manner the business of the Mills is divided into departments or just what a department is. The Board of Review, however, found that some employee in every department in which claimants worked was out on strike and that accordingly none of the claimants brought themselves within 5 (d) (2) of the Act. In other words, the Board construed "grade or class" to be equivalent to a department. We are not able to agree to this construction. We think such construction would in many instances defeat the purposes of the statute—protection of involuntary unemployment.

In the case before us there were twenty-eight departments in the plant. There appear to have been Union and non-Union workers in most of these departments. The non-Union members seem to have been contented with wages, hours, and working conditions. The members of the Union were discontented with wages, hours, and working conditions and went out on strike. The strike assumed such proportions that the Mills had to close, and, according to the Board, every employee in a

department where a striking employee had worked became ineligible for compensation. This, though the particular employee had no connection whatever with the strike and apparently opposed it.

There is a conflict of authority as to whether employees not participating in the labor dispute but who will ultimately benefit if the strike succeeds are "directly interested" therein under (d) (1). That disqualification, however, is out of this case by reason of the stipulation.

■ In the second section of the Unemployment Compensation Act the Legislature expressly declares that the purpose of the measure is "the benefit of persons unemployed through no fault of their own." And it is the province of the Court so to construe this Act as to effect its declared purpose.

We think that "grade or class," as used in the statute, means a group more or less organized. Not necessarily a local CIO or AFL branch, nor a company union, but at least a cohesive group acting in concert, where the striking member acts with the sanction of his associates, in their behalf.

■ It has been suggested that there is an apparent inconsistency between the general words of section 2 of the statute and the provisions of section 5 (d) (2) and reference is made to the rule that where general words and specific words of a statute conflict, the latter will prevail. As we construe the statute, however, there is no inconsistency in its parts mentioned. One involuntarily unemployed should not be deprived of benefits by the act of his group member who participates in a strike, unless his group is of the character we have indicated.

We are referred to decisions of administrative boards which are said to sustain the ruling of the Board of Review herein. We are also referred to the following

court decisions: *Huit* v. *Boyd,* 64 Ga. App., 564, 13 S. E. (2d), 863; *In re Steeleman,* 219 N. C., 306, 13 S. E. (2d), 544; *Johnson* v. *Pratt et al.,* 200 S. C., 315, 20 S. E. (2d), 865; *Chrysler Corporation* v. *Smith,* 297 Mich., 438, 298 N. W., 87, 135 A. L. R., 900. In most of these decisions, both from administrative boards and courts, the existence of grades or classes within the statute seems to be assumed—not controverted.

The only one of the opinions that makes any effort to define ''grade or class'' is the South Carolina case above cited. That involved employees of a cotton mill and all of them were held to belong to the same grade or class, for one reason, as we understand the opinion, that all of them were represented by a single bargaining agency. To this extent the reasoning of the Court accords with our view of the meaning of the words ''grade or class'' as indicated heretofore.

We are likewise referred to a report of a British unemployment insurance committee, known as the Blanesburgh Committee, which undertakes to explain the purpose of the provision carried into our statute at 5(d) (2). In that report it is said:

''The more it is possible to classify claims to benefit on a broad basis, the less difficult, it is said, will administration be, and the less delay in the payment of benefit. Again, the wider the scope of disqualification, the less tendency will there be, it is argued, for a stoppage of work to be embarked on by the withdrawal of a small number of pivotal men in the knowledge that the majority of those who lose employment as the result of the stoppage will get benefits and so augment the workers' fighting funds. It may perhaps, however, be observed in this connection that the provision can only be operative to discourage this class of stoppage where the workers

who are not actually called out are the same grade or class as some of those who are called out. Again, from the workers' point of view, the provision in question discourages defections from a union which calls a strike. Membership of the grade or class, irrespective of membership of the union, involves disqualification, and there is, therefore, no temptation to forsake the union.''

In regard to this report it might be observed that those of the unemployed who would use their benefits to finance the strike, in our opinion, would be participating in the same and would be ineligible to benefits under (1). From the standpoint of the Union, at this time in this country, organized labor is too strong financially and otherwise to make it probable that defections of its members would weaken the effect of any strike it called. Moreover, there is a degree of obloquy attached to the word ''scab'' in labor circles which would deter desertion from Union ranks.

Grades and classes, both in society and industry, have been more sharply defined in England than in this country. The groups are more distinct, the membership more closely knit. All laws applicable to conditions there are not applicable here.

As a matter of history, organizations such as our Labor Unions, with much the same purposes in view, were for a long time prohibited by law in England. This, if nothing else, would tend to bring particular groups of workers closer together.

If it be said that section (2) of our unemployment compensation statute is merely a preamble, still it is well settled that the preamble of a statute may be looked to as a guide in the construction of the same where there is doubt or ambiguity as to the scope of the enacting clauses.

Lewis' Sutherland Construction, section 341; 59 C. J., 1004; 25 R. C. L., 1030.

A statute similar to our unemployment compensation statute has been enacted in most of the States. It seems to be a sort of uniform statute. There is, however, so far no settled judicial construction of section 5(d) (1) (2) and we have felt free to interpret the statute in the manner which in our opinion harmonizes all its parts and effectuates its intent.

We do not think our construction of the statute will make difficulties in its administration. By force of the language used, the burden is on the claimants for compensation to bring themselves within the exceptions of (1) and (2) of (d). This we think the claimants have done in this case.

The decree of the chancellor recited that the claimants had contracted with their attorneys for a 25% attorneys' fee and approved said contract, declared a lien on the recovery to secure the fee, and ordered "the Board of Review and Commissioner of Labor to deduct said percentage from the benefits to be paid to each petitioner herein" and to pay the aggregate of said sum so deducted directly to the attorneys.

This action of the court below is assigned for error and we think this assignment of error must be sustained.

Section 15(b) of the Unemployment Compensation Act provides:

"Any individual claiming benefits in any proceedings before the board of review, or the commissioner, or his or its representatives, or a court may be represented by counsel or other duly authorized agents; but no such counsel or agents shall either charge or receive for such services more than an amount approved by the board of review."

Section 15(c) of the Act, as amended by chapter 128 of the Acts of 1937, is as follows:

"No assignment of benefits; exemptions.—No assignment, pledge, or encumbrance of any right to benefits which are or may become due or payable under this act [chapter] shall be valid; and such rights to benefits shall be exempt from levy, execution, attachment, or any other remedy whatsoever provided for the collection of debt; and benefits received by any individual, so long as they are not mingled with other funds of the recipient, shall be exempt from any remedy whatsoever for the collection of all debts except debts incurred for necessaries furnished to such individual or his spouse or dependents during the time when such individual was unemployed. No waiver of any exemption provided for in this subsection shall be valid."

By reason of these statutory provisions we think the attorneys must apply to the Board of Review to fix their fee and arrange with the employees, or with the representatives of the employees by whom they were retained, for its payment.

Modified as indicated and affirmed.