GORDON ·B. WHEELER vs. DIRECTOR OF THE DIVISION OF
EMPLOYMENT SECURITY & another.

Suffolk.    May 7, 1964. — June 29, 1964.

Present: WILKINS, C.J., WHITTEMORE, CUTTER, KIRK, & SPIEGEL, JJ.

*Employment Security,* Stoppage of work through labor dispute.   *Labor.*
   *Words,* "Directly interested," "Class."

A pilot of piston-type aircraft of an airline, who became unemployed
   through a cessation of operations due to a strike of the flight engineers
   on jet aircraft of the airline, was not within the exemption afforded by
   G. L. c. 151A, § 25 (b) (1), and was disqualified under (b) from re-
   ceiving unemployment benefits where, although his union was different
   from that of the flight engineers and he neither participated in nor
   financed the strike, it appeared that, if the flight engineers prevailed,
   the number of pilots on jet aircraft would be reduced and he and the
   other pilots of piston-type aircraft might be affected in their employ-
   ment through operation of the pilots' seniority rules and so "had some-
   thing to lose by reason of the strike, and were directly interested in" its
   outcome.

PETITION filed in the East Boston District Court on
March 9, 1963, for review of a decision of the board of re-
view in the division of employment security.

The case was heard by *Loschi, J.*

*James F. Sullivan* for the petitioner.

*Joseph S. Ayoub,* Assistant Attorney General (*Israel L.
Cohen* with him), for the Director of the Division of Em-
ployment Security.

*Alvin Green,* of New York, for Eastern Air Lines, Inc.,
submitted a brief.

CUTTER, J.   Wheeler was and is·a captain-pilot employed
by Eastern Air Lines, Inc. (Eastern), also named as a re-
spondent.   For some time prior to June 23, 1962, Eastern's
flight engineers had been negotiating a new labor contract
with Eastern.   There was in dispute principally a "pro-
posed reduction of the crew complement in jet aircraft by
one member, [from four members (three pilots and one
flight engineer) to three members], with the flight engineers

insisting that the third member of the crew should come up from the ranks of airline mechanics with a flight engineer's ticket, while . . . [Eastern] wanted the third seat occupied by a so-called pilot-trained mechanic."[1] The negotiations "reached an impasse." The flight engineers called a strike. Eastern cancelled all flights. All employees in Massachusetts, with few exceptions, were laid off, and there was a complete cessation of operations.

Wheeler claimed unemployment compensation. The director disqualified him from receiving benefits for the week ending June 30, 1962, and during subsequent weeks, while stoppage of work continued because of a labor dispute at his place of employment, to and including September 13, 1962. The board of review affirmed the determinations of the director. Wheeler thereupon filed this petition for review in the East Boston District Court. The trial judge concluded that "the findings of the [b]oard of [r]eview were warranted by the evidence"[2] and in effect affirmed the board's decision. Wheeler appealed. The case is before us upon the report of the district judge.

---

[1] An explanation of the issues of the strike published by Eastern was admitted in evidence before the board of review. It said in part, "Some of the major air carriers and most of the smaller airlines have been operating jets with three man crews. Eastern and other major carriers have been using four men — 3 pilots and a fourth crew member with Flight Engineer qualifications. From their own and the industry experience, these carriers have now determined that the third pilot is not necessary for safe, efficient jet operation. All Government agencies, all of the Presidential fact-finding boards, and the [u]nions of the [p]ilots and [f]light [e]ngineers, independently, agree that jet crews should be made up of 3 men only."

[2] The judge in his report summarized the evidence before the board concerning the duties of Wheeler, the co-pilot, and the flight engineer as follows: that Wheeler "was a captain-pilot . . . that as a captain-pilot he is manager of the aircraft . . . [and] is in complete command from the time he steps into the aircraft until he delivers it safely to its destination; that the co-pilot . . . and the flight engineer are under the direct supervision of the captain-pilot; that the duties the captain-pilot delegates, on a piston-type aircraft (the only type based at Boston by Eastern) to the flight engineer are a walk-around inspection of the aircraft, supervising gassing" and assisting the pilots during mechanical operation of the aircraft; "that . . . only aircraft that have a gross weight of over 80,000 pounds are required . . . to carry a flight engineer [see 14 CFR (1964) § 40.263], and about 25% of Eastern's flights are flown without a flight engineer; that a flight" engineer's main duties are to ascertain and report to the captain on the performance of the engines; that "the pilots are the only ones qualified to fly the aircraft . . . while the flight engineer . . . is not licensed to fly the aircraft; that on the . . . Electra [jet] aircraft the engineer's duties consist primarily of operating four . . . oil cooler controls."

The board of review found that a group of claimants, of whom Wheeler was one, had been "operating from the Logan Airport, East Boston."[3] Their authorized collective bargaining agent was Air Line Pilots Association, International. The flight engineers were represented by a different union. If "the flight engineers prevailed" in their contention, they would lose no position in jet aircraft "and the pilots would lose one job now held down by a pilot. . . . [E]xcept for the labor dispute work stoppage, the claimants would have been in employment. Therefore, their unemployment was due to that cause."

The board's findings continued, "There was no evidence of refusal to pass picket lines . . . [or] that the claimants in any way financed the action of the striking flight engineers. . . . [A] finding would be justified that the claimants . . . were, in fact, opposed to the striking employees. . . . If the flight engineers prevailed, the pilots would lose one crew member in most . . . flights, and this definitely indicates that they had something to lose by reason of the strike and were directly interested in the outcome of the strike. . . . It was advanced by counsel . . . that since none of the planes based at Logan Airport were jet-propelled, and all of the claimants operated from Logan Airport, they would not be affected by the outcome . . . . With this we do not agree. . . . [W]e find that if the flight engineers prevailed, it would affect the claimants somewhere along the line as members of the same union. . . . [I]t was admitted that some seniority adjustment would be necessary."

---

[3] There was also evidence that, during the strike, Wheeler "attempted to go to work by applying at employment agencies and [that he] called or went to the Logan Airport office of Eastern daily, asking . . . for work and in so doing continually crossed the picket-line of the flight engineers . . . that other commercial airlines were definitely restricted from hiring him as a pilot because of their seniority lists and age requirements . . . that there was no relationship between his union and the" flight engineers' union "of liaison or agreement or strike pact; that he was not participating in the strike; that he has nothing to gain with respect to wages, hours or conditions of employment, but is interested in the end of the strike only because he was unemployed; that if the petitioner now applied for employment at Northeast Airlines he would be put at the bottom of its seniority list, and would not be employed until all pilots on furlough from Northeast had been recalled; that he is not on furlough and is not and will not receive any furlough pay under his union contract." Eastern's manager of operations in Boston testified in substance,

The board concluded (with reference to the provisions of § 25 [b] [2]), "Although the claimants obviously occupy positions of greater responsibility, receive more pay, require greater training, and belong to a different union than the strikers, this does not prevent them from being in the same *class* within the meaning of the [1]aw. The real test is whether . . . all are engaged in an integrated operation which, under normal conditions, could not be performed one without the other. . . . Their work was mutually dependent and correlated. The failure of one group to work made it impossible for the other groups to continue. They performed work under the same general conditions and under the same management as those who were on strike, and while there may have been a difference in the grade of work and the rates of pay between the groups, being air flight personnel they were all in the same class. Consequently, the claimants do not meet the exceptions provided by the" applicable statutes (emphasis supplied).

This case arises under G. L. c. 151A, § 25 (as amended through St. 1959, c. 554), which is set out in the margin.[4]

among other matters, that in the piston-type aircraft there would be no reduction from three men (two pilots and one engineer) and that the third man in piston-type aircraft will not be trained as a pilot, but will be a flight engineer. Eastern has filed a brief in which "it takes no position in objection or opposition to . . . [Wheeler's] prayer for relief."

[4] Section 25, as so amended, reads, "No waiting period shall be allowed and no benefits shall be paid to an individual under this chapter for — . . . (b) Any week with respect to which the director finds that his unemployment *is due to a stoppage of work which exists because of a labor dispute at the . . . premises at which he was last employed;* provided, however, that nothing in this subsection shall . . . deny benefits to any individual who becomes involuntarily unemployed during the period of the negotiation of a collective bargaining contract, in which case the individual, if otherwise eligible, shall receive benefits for the period of his unemployment but in no event beyond the date of the commencement of a strike or lockout; and provided, further, that this subsection shall not apply if it is shown to the satisfaction of the director that — (1) He is not participating in or financing or directly interested in the labor dispute which caused the stoppage of work; and that (2) He does not belong to a grade or class of workers of which, immediately before the commencement of the stoppage, there were members employed at the premises at which the stoppage occurs, any of whom are participating in or financing *or directly interested in the dispute;* provided, that if, in any case, separate branches of work which are commonly conducted as separate businesses in separate premises are conducted in separate departments of the same premises, each such department may, for the purposes of this subsection, be deemed a separate factory, establishment or other premises" (emphasis supplied). Section 25 had also been amended in respects not here pertinent by St. 1961, c. 93, and St. 1961, c. 247. It has been amended since the flight engineers' strike by St. 1963, c. 447, § 2.

There can be no doubt that Wheeler's unemployment was caused by the labor dispute and the resulting work stoppage. Wheeler cannot obtain benefits unless he sustains the burden of showing "to the satisfaction of the director" that he meets the conditions defined in § 25 (b) (1) and also those set out in § 25 (b) (2). See *Martineau* v. *Director of the Div. of Employment Security*, 329 Mass. 44, 51.

1. We consider first the exemption afforded by § 25 (b) (1), which requires the board to be satisfied (among other things) that Wheeler was not "directly interested in the labor dispute which caused the [work] stoppage." Wheeler contends that there was no substantial evidence which would warrant the board's findings (a) "that if the flight engineers prevailed, they would hold their own position and the pilots would lose one job now being held down by a pilot," and (b) that the pilots "had something to lose by reason of the strike and were directly interested in the outcome."

In context the first finding, (a) just mentioned, relates to the controversy over the occupants of the cockpit on jet aircraft and does not relate, at least directly, to piston-operated aircraft. There is no indication in this statement that the composition of the cockpit crew of piston-type aircraft was in controversy. As to jet aircraft, the finding was warranted by the evidence of the plan to reduce the jet cockpit crew from four to three and the efforts to have the third man a flight engineer, rather than a pilot.

The second finding, (b) above, was apparently based upon the same evidence, and, in addition, upon evidence in substance that the increased competition for the diminished number of seats in jet cockpits might have some effect upon the pilots in piston-type aircraft. Wheeler himself testified that the "third pilot . . . [would be] removed from the [jet] cockpit. He has not lost his job but he is out of the jet cockpit. Q. Where does he go? A. There . . . [are] other aircraft we fly besides jets. Q. Other pilots are flying those? A. Certainly. Q. Somebody has to go? A. This is your assumption, not mine. Q. If you

. . . throw into another grade pilots on jets, you will have a surplus of pilots? A. Possibly true. Q. Somebody will lose a job? A. We have a [pilot] surplus . . . now because Eastern . . . had to curtail . . . flights.'' Although Wheeler also testified that ''In relation to this three-man pilot crew'' he could not be harmed by having flight engineers become pilot-qualified, the colloquy just set out tended to establish[5] that, through the working of the seniority rules for pilots (also in evidence), Wheeler and other piston-type aircraft pilots might be adversely affected in some measure by the outcome of the strike. We think that the board's conclusion, quoted above, that the pilots ''had something to lose by reason of the strike and were directly interested in the outcome'' meant that, if the flight engineers' position should be sustained, then each pilot of piston-type aircraft, through the operation of the pilots' seniority rules, would be likely to be affected somewhat in his opportunities for, and conditions of, employment.

In *Martineau* v. *Director of the Div. of Employment Security*, 329 Mass. 44, 46–50, this court considered § 25 (b) (1),[6] and said (p. 49), ''The claimant was not a member of the union which initiated the strike and he refrained from any activity in support of it, and the contrary is not contended. His position is, therefore, that he should not be deprived of benefits for a loss precipitated entirely by the efforts of others. That there is force in this argument cannot be denied. The statute, however, does not confine disqualification to those employees who participate in or finance the

[5] In a letter (July 30, 1962) from an assistant solicitor of the United States Department of Labor, admitted in evidence before the board, there was further substantiation of some possible effect of seniority upon the problem. The letter stated that since ''the only substantial issues relate to one category of workers — flight engineers threatened with the loss of their jobs through technological change — it appears that none of Eastern's other employees will be affected in any way by the outcome of the strike, *beyond the minor seniority modifications* that may result for pilots'' (emphasis supplied).

[6] Section 25 is closely similar to the provisions in effect in other States (see Lewis, The Law of Unemployment Compensation in Labor Disputes, 13 Labor L. J. 174, 177–178), which in turn were largely based upon the language of § 26 of the British Unemployment Insurance Act (1935) (25 Geo. 5, c. 8). See Draft bills for State Unemployment Compensation, Social Security Board, September, 1936, pp. 13–14; Hughes, Principles Underlying Labor-Dispute Disqualifications (1946) pp. 1–5; Metropolitan Life Insurance Co. British Experience with Unemployment Insurance, part 3 (1932) pp. 65–66.

labor dispute. In addition, it withholds benefits from employees who are 'directly interested in the labor dispute.' . . . Most of the statutes in other jurisdictions contain provisions . . . similar to § 25. Although the authorities are not uniform, the prevailing view is that a person is 'directly interested' in a dispute when his wages, hours, or conditions of work will be affected favorably or adversely by the outcome. It is of no consequence that the person is not a member of the union conducting the strike or that he may not be in sympathy with its purposes.'' The *Martineau* case was remanded to the board of review because the board's findings of fact were inadequate, but in taking this action, the court pointed out (p. 51) ''that the claimant has the burden of proving that he comes within . . . [the] exceptions'' of § 25 (b) (1) and (2). See *Nobes* v. *Unemployment Compensation Commn.* 313 Mich. 472, 479–481 (nonunion members possibly interested because of an effort by the union to put ''into effect among all employees a seniority rights system''); *General Motors Corp.* v. *Unemployment Compensation Commn.* 321 Mich. 724, 728 (reversing 321 Mich. 604 on rehearing); *Henzel* v. *Cameron,* 228 Ore. 452, 464–466 (all truck drivers, long line as well as terminal, interested in the result of a lockout); *Cameron* v. *DeBoard,* 230 Ore. 411, 416–417, 426–428; *In re Deep River Timber Co.* 8 Wash. 2d 179, 183–184 (interest by one of two unions in having an employee discharged, and the other one having him retained; but see *Wicklund* v. *Commissioner of Unemployment Compensation,* 18 Wash. 2d 206, 216–222).[7]

---

[7] See also *Huiet* v. *Boyd,* 64 Ga. App. 564, 568–571; *Kemiel* v. *Review Bd.* 117 Ind. App. 357, 359; *Auker* v. *Review Bd.* 117 Ind. App. 486, 491–493; *Stahlman Unemployment Compensation Case,* 187 Pa. Super. 246, 250–251; Shadur, Unemployment Benefits and the ''Labor Dispute'' Disqualification, 17 U. of Chicago L. Rev. 294, 329–332, 332–337; Lewis, The Law of Unemployment Compensation in Labor Disputes, 13 Labor L. J. 174, 192–193, 193–195; Williams, The Labor Dispute Disqualification, 8 Vand. L. Rev. 338, 350–351; Haggart, Unemployment Compensation During Labor Disputes, 37 Neb. L. Rev. 668, 683–684, 684–685; note, 49 Col. L. Rev. 550, 561–563, 564–565; note, 33 Minn. L. Rev. 758, 762, 763; Annotation, 28 A. L. R. 2d 287, 337–340, 340–343. In general, the second group of pages mentioned in respect of each article or note cited above refers not to the disqualification based upon direct interest but to that concerning employees of the same grade or class. See G. L. c. 151A, § 25 (b) (2).

Cf. *Outboard, Marine & Mfg. Co., Johnson Motors Div.* v. *Director of Labor,* 403 Ill. 523, 536–539 (office workers not directly involved in factory workers' strike); *Kieckhefer Container Co.* v. *Unemployment Compensation Commn.* 125 N. J. L. 52, 54. Cf. also *Department of Ind. Relations* v. *Drummond,* 30 Ala. App. 78, 82. Although the extent of the pilots' interest may not have been very great, that interest was "direct" in so far as their seniority or their opportunities for work might be affected. Under principles stated in the *Martineau* case, we think that the burden was upon Wheeler to satisfy the review board that he was within the exemption from disqualification provided by § 25 (b) (1). In the light of the evidence already quoted or referred to, and in the absence of evidence requiring the conclusion that the claimants had no interest in the outcome of the strike, the review board's decision was proper.

2. The board also held that Wheeler was not within the exemption (from disqualification to receive benefits) provided by § 25 (b) (2), because he was "engaged in an integrated operation" with the strikers and was, accordingly, to be regarded as in the same "class" with the strikers. The board thus apparently gave to the word "class" a broader interpretation than that normally attached to the word "grade" (see § 25 [b] [2], fn. 4, *supra*) and concluded that pilots and flight engineers operating in aircraft cockpits as an integrated team constituted a single class. The board's decision was thus consistent with cases in other jurisdictions,[8] which have in general reached the conclusion that where the claimants, although not precisely comparable in work status to strikers, had duties closely related to

---

[8] See e.g. *Bethlehem Steel Co.* v. *Board of Appeals,* 219 Md. 146, 151, 154; *Unemployment Compensation Commn.* v. *Lunceford,* 229 N. C. 570, 572; *Cameron* v. *DeBoard,* 230 Ore. 411, 417–421, 424–426; *Oliver Unemployment Compensation Case,* 189 Pa. Super. 362, 364–366; *Busynko Unemployment Compensation Case,* 191 Pa. Super. 434, 437–440, affd. by an evenly divided court sub nom. *Bethlehem Steel Co.* v. *Unemployment Compensation Bd. of Review,* 402 Pa. 202; *Johnson* v. *Pratt,* 200 S. C. 315, 339–341. See also *Local No. 658, Boot & Shoe Wkrs. Union* v. *Brown Shoe Co.* 403 Ill. 484, 492–493; *Brown Shoe Co.* v. *Director of Labor,* 405 Ill. 384, 392–395; *Adams* v. *Review Bd.* 121 Ind. App. 273, 277–279; and also the articles cited above, fn. 7. Cf. *Queener* v. *Magnet Mills, Inc.* 179 Tenn. 416, 422–426.

the same manufacturing process as that in which the strikers were engaged, the claimants were not freed from disqualification by exemption provisions similar to § 25 (b) (2). The question is novel in Massachusetts. See the brief reference to § 25 (b) (2) in the *Martineau* case, 329 Mass. 44, 50. Because Wheeler has not shown that he was within the exemption provided by § 25 (b) (1), there is now no occasion for us to determine whether he has also failed to bring himself within the exemption from disqualification provided by § 25 (b) (2).

The decision of the District Court affirming the decision of the board of review is affirmed.

*So ordered.*