846

Ben MERRITT and wife Bonnie R. Merritt, Plaintiffs-Appellants,

v.

WILSON COUNTY BOARD OF ZONING APPEALS, Composed of W.J. McCluskey, John Acuff, Jerry McPeak, Ralph McKee and Harry Alexander and Sandy Donnell, Defendants-Appellees,

and

WOODLAKE CONDOMINIUM HOMEOWNERS ASSOCIATION, INC., and W. Warren Graham and wife, Barbara D. Graham, and Other Homeowners in Woodlake Condominium Horizontal Property Regime Similarly Situated, Plaintiffs-Appellants,

v.

FIRST AMERICAN NATIONAL BANK OF NASHVILLE, Tennessee, Defendant,

and

Ben Merritt and wife, Bonnie R. Merritt, Cross-Defendants-Appellants,

Green Harbor Homeowners Association, Inc., Intervenor Defendant-Appellee,

and

Hermitage Harbor Neighborhood Association, Intervenor Defendant-Appellee.

Court of Appeals of Tennessee, Middle Section, at Nashville.

March 29, 1983.

Application for Permission to Appeal Denied by Supreme Court Aug. 22, 1983.

Thomas V. White, Nashville, Joe Lukomski, Hermitage, for plaintiff-cross-defendants-appellants, Ben Merritt and wife Bonnie R. Merritt.

James H. Kinnard, Susan C. Parkes, Lebanon, for plaintiffs-appellants, Woodlake Condominium Homeowners Ass'n, Inc., et al.

Robert T. Rochelle, County Atty. for Wilson County, Lebanon, for defendant Sandy Donnell.

E.R. Woolard, Woolard & Bishop, Lebanon, for defendant intervenors-appellees Green Harbor Homeowners Ass'n, Inc., et al.

Alfred T. MacFarland, Lebanon, for defendant intervenor-appellee Hermitage Harbor Neighborhood Ass'n.

## OPINION

LEWIS, Judge.

This case results from the consolidation of two cases—one concerning an easement of ingress and egress over an adjacent property to serve a proposed multi-family housing development and one concerning the authority and jurisdiction of the Wilson County Board of Zoning Appeals to deny approval for lack of sufficient ingress and egress. In addition, another issue raised on appeal was the proper standard for summary judgment on the question of damages when malice must be proved to recover damages.

On April 7, 1981, plaintiffs Ben Merritt and wife Bonnie R. Merritt (Merritts) filed an application for a site plan approval with the Wilson County Board of Zoning Appeals (Board) for construction of apartments on a tract of land zoned for multi-family housing. The Board gave the plan preliminary approval but on September 22, 1981, denied final approval for lack of proper ingress/egress to the property. The Merritts then filed a petition for writ of certiorari and mandamus and alleged, inter alia, that the Board exceeded its jurisdiction and/or acted illegally or arbitrarily and abused its discretion. On October 27, 1981, a petition to intervene was filed by Woodlake. An order was entered on November 2, 1981, granting Woodlake's petition to intervene. On November 2, 1981, the Board filed its answer admitting that it had acted "without legal foundation." Also, on November 2, 1981, Woodlake filed its complaint against First American National Bank of Nashville (First American) and the Merritts seeking to quiet title to common elements of Woodlake Condominium by having the burden of an easement across the property removed or restricted. Subsequently, the petition for writ of certiorari and mandamus was consolidated with the suit filed by Woodlake to quiet title. On November 20th, a group of individuals living in the Hermitage Harbor area, which is adjacent to the Merritts' property, moved for leave to intervene. Their petition to intervene was granted. On December 14th a petition to intervene was filed by the Green Harbor Homeowners Association (Green Harbor). This petition was also granted.

On January 27, 1982, the Merritts filed a second amended petition for writ of certiorari and mandamus seeking to recover damages from the individual and corporate-intervening defendants. This amended petition also sought damages from Wilson County Commissioner Sandy Donnell, who had on October 25, 1981, filed a resolution with the governing body of Wilson County to have the Merritts' property zoned to prohibit multi-family dwellings. Each of the intervening defendants and Sandy Donnell filed a motion for summary judgment as to the issue of damages.

Following hearings on the petition for writ of certiorari and on the action to quiet title to Woodlake Drive, the Chancellor found in favor of the Merritts. The court granted the writ of certiorari and remanded the Merritts' application for site plan approval to the Board with instructions to approve the site plan as presented or to make such modifications as would be proper. In the action to quiet title, the court declared that the Merritts had an easement for ingress and egress over Woodlake Drive to their property and that the easement

could be used to accommodate the traffic from the apartment complex to be constructed on the Merritts' property.

On July 7th, the court granted the motion for summary judgment as to the issue of damages and dismissed the Merritts' second amended petition.

A final order was entered on July 16, 1982, setting out all rulings of the court.

Woodlake has appealed from the order that grants the Merritts' writ of certiorari and that declares "that Woodlake Drive, ... is subject to an easement for ingress and egress to and from the property owned by Ben and Bonnie Merritt, and that said easement may be used to accommodate the traffic from the 250 unit apartment complex which is planned for the Merritts' property." The Merritts have appealed from the order granting the motion for summary judgment as to the issue of damages. We first discuss the issues presented by Woodlake.

THE EASEMENT

Woodlake has presented two issues concerning the easement. They are as follows:

A. Under the powers reserved through the Master Deed of Woodlake Condominiums, did First American National Bank of Nashville have the power to reserve unto itself an easement by a Deed of Correction?

B. Does the "Deed of Correction" as executed on January 13, 1977, reserve to First American National Bank of Nashville an easement of ingress and egress through and across the condominium property to the property now proposed as the site for Harbor House Apartments?

The facts pertinent to the case regarding the easement are as follows:

The Merritts are the owners of a 28.84 acre tract of land which is located between the property of Woodlake and Old Hickory Lake in Wilson County. The property is zoned R–2, or residential, which permits group-housing developments under the Wilson County Zoning ordinance.

In 1973, both the tract now owned by the Merritts and the Woodlake tract was owned by David Pollack. In June, 1973, these tracts were zoned R–1. Although R–1 is residential, it would not permit multi-family housing. Pollack applied for rezoning of his property to R–2. It was rezoned in July, 1973, and has remained an R–2 zone since that time.

Prior to rezoning the property in 1973, the Wilson County Quarterly Court was presented with a map of a proposed condominium complex for the site consisting of 366 units and 10 duplexes. Only 68 units (the condominiums at Woodlake) have been built so far on the entire site.

In July, 1973, when all the property was zoned R–2, the only access to which is now the Merritts' property was through Woodlake Drive. In July, 1976, First American owned both the property now owned by the Merritts and the Woodlake property. On July 1, 1976, First American recorded the master deed to Woodlake in the Register's Office of Wilson County. Section 1.13 of the master deed defines the plat of Woodlake Condominiums by making specific reference to "the plat or plats of survey of record in Plat Book 14, page 61" in the Wilson County Register's Office. The plat referred to in the master deed was recorded on July 1, 1976. Page two of the four-page plat shows by diagonal, parallel lines on Woodlake Drive the existence of an easement for ingress and egress over Woodlake Drive which runs through the Woodlake Condominium complex to the lake property to the north which is now owned by the Merritts and is the subject of this suit.

All Woodlake Condominium units were purchased after July 1, 1976. Each purchaser had notice of the existence of the plat and easement over Woodlake Drive at the time of purchase. Each of the warranty deeds to the condominium owners states: "This conveyance is made subject to: (1) Restrictions of record in Book 295, page 315 (the Master Deed), and (2) terms and conditions of the Master Deed of record in Deed Book 295, page 315, . . . ." The restrictions and conditions in the master deed include

the reference to the plat which shows the easement for ingress and egress through the Woodlake Condominium property.

On January 13, 1977, a "Deed of Correction" to correct the master deed was filed in the Register's Office of Wilson County. The "Deed of Correction" stated, in part, as follows:

NOW THEREFORE, said First American National Bank of Nashville and Woodlake Condominiums Homeowners' Association, Inc. hereby correct said Master Deed by reserving to First American National Bank of Nashville perpetual easements through, under and over the property described in Exhibit A to said Master Deed for water, sewer, electricity, and gas as may be appropriate, specifically including, but not limited to, those lines, pipes and facilities in existence at this time, and an easement of ingress and egress over and upon a certain road in existence and shown by diagonal parallel lines on the recorded plat of Woodlake Condominiums which is of record in Plat Book 14, page 61, Register's Office of Wilson County, Tennessee.

First American National Bank of Nashville reserves a perpetual right and easement to install and maintain such road and utility lines and pipes as it deems necessary and appropriate and a perpetual right and easement to go upon the lands of the property regime for the purpose of inspecting, maintaining, and repairing said road and utility lines and pipes.

The deed of correction was signed by Fred Barringer as banking officer of First American and by Cauley Harris Haston, President of Woodlake Condominium Homeowners Association, Inc. Haston was also an employee of First American.

On January 25, 1977, First American turned over the management and responsibility of Woodlake Condominiums to the residents. At that time a new board of directors for Woodlake was elected.

The uncontroverted testimony is that from the first time plaintiff Ben Merritt began negotiating to purchase the lake property from First American in the fall of 1976, Merritt was told by Cauley Harris Haston there was an easement for ingress and egress through Woodlake to the lake property. The evidence is that Merritt was shown David Pollack's original development plan by Haston and that Merritt was told about, and inspected, the Woodlake master deed, as well as the plats referred to in the master deed which showed the Woodlake easement. Merritt relied on all of this information and documentation that the easement rights existed in deciding to purchase the subject property.

On September 28, 1977, a warranty deed, dated September 26, 1977, was recorded in the Register's Office of Wilson County, Tennessee, conveying two tracts of land in Wilson County from First American to Ben Merritt and wife, Bonnie R. Merritt, d/b/a Ben Merritt Construction Company. These tracts are immediately adjacent to the Woodlake Condominiums, one being south of Woodlake between the condominiums and Saundersville Road, and the other being north of Woodlake between the condominiums and Old Hickory Lake. The September 26, 1977 deed does not refer to the master deed of Woodlake, the plat of Woodlake, or the passing of any interest in an easement to the Merritts. The deed is signed by First American National Bank in Nashville by Cauley Harris Haston, Assistant Vice President.

Some four years later an instrument entitled "Deed of Correction" was recorded in the Register's Office of Wilson County to correct the deed conveying the two tracts by First American to the Merritts. This deed of correction grants to the Merritts a specific and perpetual easement for the purposes therein stated, including "an easement of ingress and egress."

The proof is that First American retained control over the Woodlake Condominium Homeowners Association until the January 25, 1977 turnover. This control was retained by First American pursuant to Section 4.05 of the master deed which is, in part, as follows:

4.05. DEVELOPER'S RIGHTS: Notwithstanding any of the other provisions of this Master Deed or the Bylaws to the contrary, the first and all subsequent Boards shall consist solely of three (3) individuals designated by the Developer, which individuals may, but need not, be Voting Members until the first to occur of any of the following (the "Turnover Date"):

(a) Developer has conveyed forty-six (46) Dwelling Units to purchasers for value;

(b) Developer elects to terminate its sole control, by written notice of such election to the Owners.

There is evidence that, at the "turnover meeting" on January 25, 1977, Cauley Harris Haston announced to all Woodlake Condominium owners present that First American had reserved an ingress-egress easement through Woodlake Condominiums.

McCoy Zachery, Vice President of First American, and Clay Zorn, a former president and board member of Woodlake, testified that First American had reserved the Woodlake Drive easement pursuant to Section 2.08 of the Woodlake master deed. Section 2.08 of the master deed is as follows:

2.08 ADDITIONAL EASEMENTS: In addition to the easements, provided for herein the Board, on behalf of all the Owners, shall have the right and power to grant such easements with respect to the Common Elements as the Board deems necessary and proper. In addition, the Board shall grant such easements as the Developer may from time to time request including, but not limited to, such easements to the Developer as may be required to construct, keep and maintain improvements upon the Common Elements. Each person by acceptance of a deed, mortgage, trust deed, other evidence of obligation, or other instrument relating to a Unit Ownership, shall be deemed to grant a power coupled with an interest to the Board, as attorney-in-fact, to grant the easements provided for in this Section. Any such easement shall be executed by the President and attested to by the Secretary of the Association and duly Recorded.

Zorn also testified that while he was president of Woodlake, he had asked Ben Merritt's permission to put up a chain at the end of the paved portion of Woodlake Drive, and that he had admitted to Ben Merritt that the Merritts did, in fact, have an ingress/egress easement through Woodlake for their development of the lake property.

McCoy Zachery and Ben Merritt testified that the deed of correction from First American to the Merritts, dated September 9, 1981, was executed simply because the Wilson County Planning Commission had asked for clarification of the existence of the easement in order to determine whether to approve the Merritts' site plan for the proposed apartment complex. Zachery testified that the easement rights had already been granted to the Merritts prior to the execution of the September 1981 deed of correction.

The master deed and plat of Woodlake Condominiums were both filed in the Register's Office of Wilson County on July 1, 1976. The master deed set out the powers and limitations of the Board of Directors of Woodlake and the powers and limitations of the developer, First American.

Section 2.08 of the master deed grants to the Board of Directors of Woodlake the power to grant easements "as the Board deems necessary and proper," and further, "the Board shall grant such easements as the Developer may from time to time request."

The Chancellor determined that the Merritts had an easement for ingress and egress over Woodlake Drive since First American had reserved unto itself the easement by the January 13, 1977 "Deed of Correction."

Woodlake contends that First American did not have the power and authority to amend the master deed by the January 13, 1977 "Deed of Correction." In support of this contention, it cites Section 8.07 of the master deed, which is as follows:

SPECIAL AMENDMENTS: Developer reserves the right and power to record a special amendment ('Special Amendment') to this Master Deed at any time and from time to time which amends this Master Deed (i) to comply with the requirements of the Federal National Mortgage Association, the Government National Mortgage Association, the Federal Home Loan Mortgage Corporation, the Department of Housing and Urban Development, the Federal Housing Administration, the Veterans Administration, or any other governmental agency or any other public, quasi-public or private entity which performs (or may in the future perform) functions similar to those currently performed by such entities and/or (ii) to induce any of such agencies or entities to make, purchase, sell, insure, or guarantee first mortgages covering Dwelling Units. In furtherance of the foregoing, a power coupled with an interest is hereby reserved and granted to the Developer to make or consent to a Special Amendment on behalf of each Owner. Each deed, mortgage, trust deed, other evidence of obligation, or other instrument affecting a Dwelling Unit and the acceptance thereof shall be deemed to be a grant and acknowledgement of, and a consent to the reservation of, the power of the Developer to make, execute and record Special Amendments. No Special Amendment made by Developer shall affect or impair the lien of any first mortgage upon a Dwelling Unit or any warranties made by an Owner in order to induce any of the above agencies or entities to make, purchase, insure, or guarantee the first mortgage of such Owner's Dwelling Unit.

■ We are of the opinion that the reservation of the easement was not pursuant to Section 8.07 but was pursuant to Section 2.08. As we have noted, Section 2.08 of the master deed grants to the Woodlake Board of Directors the power to grant easements "as the Board deems necessary and proper" and further provides that "the Board shall grant such easements as the Developer may from time to time request."

Both McCoy Zachery, Vice President of First American, and Clay Zorn testified that First American reserved the easement pursuant to Section 2.08.

In addition, the deed of correction was executed on January 13, 1977, by Cauley Harris Haston, President of Woodlake Condominium Homeowners Association, Inc. and by Fred Barrigner for First American. First American, as developer, had sole control of Woodlake on January 13, 1977, and not until January 25th did it "turnover" control. On January 13, 1977, when the deed of correction was executed, First American owned property adjacent to Woodlake and wanted ingress and egress through Woodlake to the adjacent property.

■ In September, 1977, the Merritts acquired the lake property by a general warranty deed from First American. This deed did not specifically mention the Woodlake Drive easement. However,

> [a]n easement which by grant, reservation, or prescription is appurtenant to land is not a mere privilege to be enjoyed by the person to whom it is granted or by whom it is reserved. It passes by a deed of such person to his grantee and follows the land without any mention whatever.

*Kelly v. Leach,* slip op. at 5 (Tenn.App. June 16, 1981) (*quoting* Jones, *A treatise on the Law of Easements* § 22 (1898)). Additionally, to satisfy the Wilson County Planning Commission, First American executed a "Deed of Correction" on September 9, 1981, conveying the easement to the Merritts.

The Merritts, as the Chancellor found, have an easement of ingress and egress over Woodlake Drive.

## ZONING CASE

### (Certiorari from the Board of Zoning Appeals)

In 1973, after a public hearing, the Wilson County Quarterly Court rezoned the subject property R–2 which permitted multi-family dwellings, including group housing

developments. The property has remained R–2 since 1973.

On August 7, 1981, an application was made on behalf of the Merritts to the Wilson County Board of Zoning Appeals seeking preliminary and final approval to build a 250-unit apartment complex (Harbor House Apartments) on the Merritts' property.

On August 13th the site plan was presented to the Board. After determining that the Merritts' property was zoned for a multi-family housing complex, the Board granted preliminary approval and referred the site plan to the Wilson County Planning Commission as required by the Wilson County Zoning ordinance for recommendation on design features.

The Planning Commission recommended some modifications which were accepted by the Merritts. On September 10, 1981, the site plan, as modified, was again brought before the Planning Commission. The Planning Commission then approved the site plan with access to the proposed Harbor House Apartments only through Woodlake Drive. On September 22nd the staff of the Planning Commission and Board of Zoning Appeals recommended approval of the Harbor House Apartments with access through Woodlake Drive, Rebel Road, and Green Harbor Drive, with Woodlake Drive to serve as the main access road.

On September 22nd the site plan came before the Board of Zoning Appeals where final approval was sought.

The Board of Zoning Appeals, after hearing from counsel for each of the homeowners groups, Sandy Donnell, the County Commissioner who represented the district in which the Merritts' property is located, and other individuals, all of whom spoke in opposition to Harbor House Apartments, denied by a three-to-two vote the Merritts' proposed Harbor House Apartments "due to lack of proper ingress/egress to accommodate a 250-unit apartment complex at this site." There was no finding by the Board of Zoning Appeals that the project as proposed by the Merritts, failed to comply with ordinance requirements pertaining to Group Housing Developments.

On certiorari to the Chancery Court, the Chancellor found that the Board of Zoning Appeals did not have authority or discretion to deny approval of the project on the basis of "lack of ingress/egress." The Chancellor ordered the Merritts' application remanded to the Board for approval as presented or for the Board to approve after making such modifications in the site plan as would be proper.

Appellant Woodlake presents two issues concerning the zoning case. The first is as follows:

Did the Wilson County Board of Zoning Appeals exceed its authority by denying approval of the proposed site plan of Harbor House Apartments for lack of sufficient ingress and egress?

The Merritts' application for site plan approval came before the Board of Zoning Appeals pursuant to Section 4 of the Wilson County Zoning Ordinance which gives the Board the power to hear and decide requests for special exceptions.

The pertinent portion of Section 4 is as follows:

4. *Powers.*

The board shall have the following powers and duties:

4.2 *Special Exceptions.*

To hear and decide, in accordance with the provisions of this ordinance, requests for special exceptions, such as uses allowed on appeal, or for decisions upon other special questions, such as the Group Housing Developments and Mobile Home Parks section of this ordinance, upon which the Board is authorized by this ordinance to pass. The board may at its discretion require reasonable conditions be met concerning the location of structures, access to property, noise, dust, vibrations and any other reasonable requirement the board deems necessary to protect the surrounding property when granting special exceptions, and shall require a sufficient bond for damage to roads if required by the Road Commission of

Wilson County. Prior to considering any application for an extraactive use, the board shall cause prior written notice to be forwarded to the Road Commission of Wilson County.

■ The Board of Zoning Appeals has neither the power to zone nor to amend the zoning ordinance. That power is in the county legislative body. T.C.A. §§ 13–7–101 and 13–7–105.

■ Article VI, Section 3, of the Wilson County Zoning Ordinance sets forth comprehensive requirements for a group housing development. The Merritts' property was zoned R–2 which includes group housing. A review of this record discloses that the Merritts' property met all requirements under the ordinance for group housing and that the Board did not deny the application because of failure to meet the requirements of the ordinance.

The application was denied because of a "lack of ingress/egress to accommodate a 250-unit apartment complex at this site." A denial of a zoning permit which meets all the requirements of the ordinance when there is no valid ground for denial is arbitrary and unreasonable. 101 C.J.S. *Zoning* § 224 (1958).

This Court, in *Harrell v. Hamblen County Quarterly Court,* 526 S.W.2d 505 (Tenn.App. 1975), affirmed the judgment of the Chancery Court which held that the Hamblen County Quarterly Court and Hamblen County Planning Commission had acted arbitrarily in denying plaintiffs a permit to construct a mobile home where plaintiffs had fully complied with requirements of the zoning ordinance. *See also, Sexton v. Anderson County,* 587 S.W.2d 663 (Tenn.App. 1979).

The Pennsylvania Supreme Court, in *Lower Merion Township v. Enokay, Inc.,* 427 Pa. 128, 233 A.2d 883 (1967), held that it was error for the zoning board to deny a special exception where the proposed exception was allowable under the ordinance and ordinance requirements had been met. The Pennsylvania Court stated:

A petitioner who seeks a special exception must show that the proposed use is allowable under the terms of the ordinance which permits special exceptions. [Citations omitted.] In the instant case, there is no serious dispute that the proposed use is allowable under the terms of the Ordinance. Having shown that the use is allowable, there is no burden on the petitioner to show that the use would not damage the health, safety and morals of the community.
The Board concluded that the health, safety, welfare and morals of the community would suffer if the proposed use were permitted, because there would be a generation of new traffic which the road system in the area could not bear. The Board stated: ". . . . the road system adjacent to the property is critically over crowded and that the (construction of the building) would cause a serious, additional traffic burden." . . .
[A]n increase in traffic, standing alone, does not constitute a sufficient reason to refuse a property owner the legitimate use of his land.

*Id.* at 131–132, 233 A.2d at 885.

Woodlake further contends that the Board of Zoning Appeals was acting within its jurisdiction in denying the application for "lack of ingress/egress." Its argument, in effect, is that even though the Merritts' property may have met all specific criteria for a Group Housing Development, the Board can deny an application under the purposes clause of the Wilson County Zoning Ordinance because the general welfare could be affected if the permit were granted.

In rejecting this same type argument, Judge Sanders, writing for the Court in *Harrell,* stated:

The Appellants argue that this provision of the ordinance gives the Planning Commission the discretion to deny a permit at any place where, in their judgment, the general welfare of the community might be affected.

■ We cannot agree. Section I is the preamble of the ordinance. It is well

settled in this state that the preamble of a statute or ordinance may be looked to in determining its construction but it is not a part of the controlling provisions of the ordinance. *Memphis Street Railway Co. v. Byrne,* 119 Tenn. 278, 104 S.W. 460; *Queener v. Magnet Mills,* 179 Tenn. 416, 167 S.W.2d 1; *City of Kingsport v. Jones,* 196 Tenn. 544, 268 S.W.2d 576.

It is obvious that the Planning Commission and the Quarterly Court denied the permit to the Petitioners because of the objection of adjacent property owners, which they were without authority to do. 101 C.J.S. Zoning, § 224.

■ Although these adjacent property owners may be justifiably concerned as to the adverse effect that may be had on the value of their property, this does not permit an administrative agency to deny an adjoining property owner the right to use his property for lawful purposes and not in violation of zoning or restrictions. *Application of Garden City Jewish Center,* 2 Misc.2d 1009, 155 N.Y.S.2d 523; *Congregation Committee, North Fort Worth Congregation, Jehovah's Witnesses v. City Council of Halton City,* Texas Civ. App., 287 S.W.2d 700.

> "The grant or refusal of a permit is to a certain extent within the sound discretion of the board or official authorized to use it, but the discretion must be exercised reasonably, and if an applicant meets all of the requirements of the zoning regulations and there is no valid ground for denial of the application, the permit should be issued." 101 C.J.S., *supra.*

The Law of Zoning and Planning Chapter 55, Section 3, says:

> "So long as the application is in order and the proposed use of the property complies with applicable municipal ordinances or, where although not complying, the premises has a vested nonconforming status, the applicant is entitled to a permit, and it is the duty of the administrative officer to issue him one."

*Harrell,* 526 S.W.2d at 508–509. *See also, Keiger v. Winston-Salem Board of Adjustment,* 278 N.C. 17, 178 S.E.2d 616 (1971).

This matter was before the Chancellor under the common law writ of certiorari. The Chancellor reviewed the action of the Board of Zoning Appeals to determine if the Board "exceeded the jurisdiction conferred, or is acting illegally. . . ." T.C.A. § 27–8–101. We agree with the Chancellor's finding that the Board exceeded its jurisdiction and acted illegally.

■ Woodlake's last issue is whether the testimony of George Dean, attorney, and Samuel Edwards, Planner, [was] proper and admissible when it consisted of their opinions concerning the interpretation of the zoning law in Tennessee, the Wilson County zoning ordinance, and their opinion as to whether or not the Appeals Board exceeded their jurisdiction.

In other words, Woodlake's insistence is that both Dean and Edwards testified as to the "ultimate issue of law" of the case and that the Chancellor erred in relying on their testimony in arriving at his decision. Woodlake concedes that Dean and Edwards were qualified experts and could testify as to the ultimate issue of fact, *City of Columbia v. C.F.W. Construction Co.,* 557 S.W.2d 734 (Tenn.1977), but that it was error for the Chancellor to admit and rely on their testimony as to the "ultimate issue of law."

We deem it unnecessary to address this issue. This case is before us for a *de novo* hearing. Tenn.R.App.P. 13(d). Our *de novo* review of the record, without relying upon Dean and Edwards' interpretation of the law, supports the judgment of the Chancellor. Even if the Chancellor were in error in allowing Dean and Edwards to testify regarding their opinions, the error was harmless. Tenn.R.App.P. 36(b); *Berke v. Chattanooga Bar Association,* 58 Tenn. App. 636, 436 S.W.2d 296 (1968).

### SUMMARY JUDGMENT

■ The Merritts' first issue is: "Should the Court have given full consideration to Ben Merritt's deposition and the other dis-

covery materials on file in deciding the motion for summary judgment?" The Merritts correctly contend that the Chancellor "was obligated to consider not only the materials specifically offered in support of the motion, but also all 'pleadings, depositions, answers to interrogatories, and admissions' properly on file and thus before [the] court." *Smith v. Hudson,* 600 F.2d 60, 64 (6th Cir.1979), *cert. denied,* 444 U.S. 986, 100 S.Ct. 495, 62 L.Ed.2d 415 (1979). However, the Merritts have failed to point to where in the record, and our review of the record fails to disclose, the Chancellor failed to consider the entire record in ruling on the motion. Therefore, this issue is without merit.

The Merritts' second and third issues, which we discuss together, are whether a) there "[w]as a genuine issue as to any material fact raised by the discovery materials in the file so as to require a full hearing on the merits to decide the plaintiffs' claim for damages," and b) "summary judgment [is] appropriate in the present case in light of the allegations and claims for damages for malicious and willful acts on the part of the defendants, and in light of the allegations of conspiracy."

The standard in Tennessee is that

[s]ummary judgment is to be rendered by a trial court only when it is shown that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." T.R.C.P. 56.03. A summary judgment procedure is not to be regarded as a substitute for a trial of disputed factual issues. [Citations omitted.] A party who moves for summary judgment has the burden of showing that no genuine issue of material fact exists, and in ruling on the motion the court must view the record in the light most favorable to the motion's opponent. [Citations omitted.]

*Taylor v. Nashville Banner Publishing Co.,* 573 S.W.2d 476, 480 (Tenn.App.1978), *cert. denied* 441 U.S. 923, 99 S.Ct. 2032, 60 L.Ed.2d 397 (1979).

The Merritts' action for damages is based upon the alleged willful or malicious actions by the defendants in attempting to deprive the Merritts of property rights. The Merritts alleged that defendants' actions were the result of a civil conspiracy.

The Merritts' amended petition in which they seek damages alleges that defendants "had full knowledge that the Merritts' property was properly zoned R–2 in 1973, for multi-family dwellings" and "despite this knowledge and the knowledge that the [Merritts] had expended substantial sums of money in obligations and preparation for the construction of [Harbor House Apartments], Sandy Donnell and the intervenors convinced the Wilson County Board of Zoning Appeals to take an action which was arbitrary, illegal and in excess of its authority and jurisdiction." The heart of their complaint is that the defendants conspired to convince the Board of Zoning Appeals to take an action which the Board could not lawfully take, thus causing the Merritts to be damaged.

The Merritts rely on *McKee v. Hughes,* 133 Tenn. 455, 181 S.W. 930 (1916). *McKee* was a suit by plaintiff against a number of the residents of the Village of Spring Hill, Tennessee. McKee, licensed by the Spring Hill Board of Mayor and Aldermen to do business as a general merchant, alleged that he was put out of business because defendants unlawfully conspired together to destroy his business by signing and delivering to the board of mayor and aldermen a petition which claimed that McKee's store was a public nuisance and that his license should be revoked. The board of mayor and aldermen then passed a resolution "revok[ing] the license issued to T.J. McKee."

The trial judge, in *McKee,* "instructed the jury that the defendants had a right under the law to petition the village council for redress of grievances, and that they were not bound to see that the details of that council's actions with reference to their petition was absolutely legal." *Id.* at 458, 181 S.W. at 930. The Court of Appeals reversed the trial court because of the foregoing instruction. The Supreme Court granted certiorari and, in reversing the Court of Appeals, stated:

We have no difficulty in following the court of civil appeals to its conclusion that the action of the village council in undertaking to revoke the license and in notifying McKee that he could no longer conduct his business was unwarranted by law; but we are unable to follow that court in the ruling that the defendant petitioners must respond to damages on the ground that in presenting said petition they conspired to and did cause injury to plaintiff unlawfully.

There was proof adduced by plaintiff that tended to show that he had been injured by the action taken by the city marshal under the resolution of the council. But are defendants liable as conspirators?

A "civil conspiracy" may be defined to be a combination between two or more persons to accomplish by concert of action an unlawful purpose, or to accomplish a purpose not in itself unlawful by unlawful means; the damage caused being the gist of any action. 5 R.C.L., 1061, 1091; 1 Words and Phrases, Second Series, 910.

The defendants in assembling and petitioning the village council, were proceeding in the exercise of a high constitutional privilege. By the Declaration of Rights embodied in our Constitution (Article 1, sec 23) it is provided;

"That the citizens have a right, in a peaceable manner, to assemble together for the common good, to instruct their representatives, and to apply to those invested with the powers of government for redress of grievances, or other proper purposes, by address or remonstrance."

In 8 Cyc., 894, citing *Louisiana Citizens Bank v. Orleans Parish Board* (C.C.), 54 Fed., 73, the rule is stated to be:

"The right of assembly and petition is guaranteed by the Constitutions, which secure to every person, natural or artificial, the right to apply to any department of the government for the redress of grievances, or the bestowal of a right, and also guarantee the enjoyment of such redress of the grievance, . . . when obtained, free from any penalty for having sought or obtained it."

*Id.* at 458–460, 181 S.W. at 930–931.

Further:

A number of courts hold that such petitions and all matters embraced therein, if pertinent and relevant, are absolutely privileged. But by the weight of authority they are only qualifiedly privileged; the privilege extending no further than the protection of the signers when they act without malice. Even if the complaint embodied in the petition be untrue, no action can be maintained if it was not maliciously made. *White v. Nicholls*, 3 How., [266] 226, 11 L.Ed. 591; *Kent v. Bongartz*, 15 R.I., 72, 22 Atl., 1023, 2 Am.St.Rep., 870; *Weiman v. Mabee*, 45 Mich., 484, 8 N.W. 71, 40 Am.Rep. 477. But proof of actual malice in respect of such a petition will render it libelous in character, and therefore, of course, an action would lie. *White v. Nicholls*, supra; *Dennehy v. O'Connell*, 66 Conn., 175, 33 Atl., 920, and cases cited above.

Such a petition is presumed not to be the product of the malice of its signers; they ought, in the exercise of such a constitutional privelege, to be presumed to act in the discharge of a social or public duty. The burden of proof to show malice was therefore on the plaintiff, McKee. *White v. Nicholls*, supra; *Ambrosius v. O'Farrell*, 119 Ill.App. 265; *Van Wyck v. Aspinwall*, 17 N.Y., 190. And, as seen, there was no evidence of malice that could have supported a verdict of the jury; and the trial judge was not in error in giving the instruction he did touching the fourth count of the declaration.

It may be that the petitioners misconceived the power of the council under the charter of the village, which granted the council authority to issue privilege licenses, to declare, prevent, or abate nuisances, and to prohibit or suppress disorderly houses of all kinds; further, that under such misconception they petitioned for an abatement of McKee's store as a public nuisance "by revoking his license and closing up his place of business." But

malice or bad faith are not to be imputed to the petitioners because they could not discriminate between the power of summary abatement of a nuisance *per se* and the abatement of a condition such as that shown to have been in existence at McKee's store by a judicial proceeding. Can it be that ordinary laymen, in the exercise of such a right, may be thus caught on such a fine point of law, to their undoing, as is insisted in this case? The juster view is that these men but advanced the above mode of action as a suggestion for the consideration of the members of the council, deemed by them competent to judge and act as public officials, and that they are not liable if they acted in good faith or without malice. The right of petition guaranteed to the citizen in the bill of rights should not be allowed to become a trap for the petitioner to be sprung by any such hairtrigger of technical law.

*Id.* 133 Tenn. at 462–464, 181 S.W. at 932.

We do not think it is contended by anyone that defendants in the instant case did not have a constitutional right to seek redress of their grievances before the Board of Zoning Appeals. However, if defendants conspired together, were motivated by malice, and the redress sought by them was groundless and the gratification of their malice resulted in damages to the Merritts, then the Merritts have a cause of action.

The Chancellor found, and this Court agrees, that the action of the Board of Zoning Appeals in denying the Merritts' application was groundless. There is also proof in the record from which it could be determined that the Merritts have been damaged by the failure of the Board to grant their application. Therefore, if this record shows that defendants conspired together and were motivated by malice, then the Chancellor erred in sustaining the summary judgment motions.

The defendants filed motions for summary judgment in which they alleged, *inter alia,* that "the actions taken ... were all taken without malice and in the lawful exercise of the rights they have to apply to

a governmental authority for a redress of grievances ...." An affidavit was filed in which they set forth the reasons for taking the action they took and denying that any action taken was actuated by malice.

In meeting the motions for summary judgment, the Merritts relied on the record and specifically the discovery deposition of Ben Merritt. The Merritts argue that a conspiracy actuated by malice is shown by: (1) at a meeting in August, 1981, before the Planning Commission defendant Sandy Donnell, the county commissioner representing the district in which the property is located, and Elmer Woolard, the attorney for Green Harbor, informed the Planning Commission that they did not oppose the apartment complex, only the means of access but when the matter went before the Board one month later all defendants were opposed to the apartment complex; (2) that while the petition for certiorari was pending in the Chancery Court, defendants attempted to have the subject property rezoned "into a district where apartments would be prohibited," and further alleged that any property in the area other than subject property was to remain zoned R–2; (3) that Ben Merritt testified by deposition "that Dan McDougal, an intervening defendant and a member of defendant Hermitage Harbor Neighborhood Association, Inc., knew of the expenditures and liabilities that the Merritts had incurred, and also knew of the existence of the contract to sell the property." McDougal, according to Ban Merritt's deposition, approached Ben Merritt and expressed an interest in buying the property. McDougal told Merritt that he represented a group of people. In late 1981 or early 1982, McDougal told Merritt "that he [McDougal] told me [Merritt] he was going to keep me tied up in court from now on." Merritt also testified that defendants held meetings. However, he was only able to surmise what happened at those meetings since he had no actual knowledge. Merritt also testified that "one of the persons had put their telephone number [in the newspaper] for people to call her to complain" about the apartment complex.

■ "[W]hen faced with a motion for summary judgment," it is incumbent upon the opponent of the motion "to adduce proof sufficient to show a clear entitlement to maintain [the] action." *Kilbourne v. Hanzelik,* 648 S.W.2d 932, 934 (Tenn.1983) (concurring opinion, Justice Harbison).

■ Here, the Merritts have failed to show their entitlement to maintain their action for damages. They were faced with defendants' motion for summary judgment and affidavit clearly setting forth defendants' reasons for intervening in the suit and denial that they were in anyway motivated by malice. Nowhere in the record is there any showing that defendants conspired with malice to deprive the Merritts of any property right or that a malicious conspiracy by defendants caused the Merritts damages.

The judgment of the Chancellor in all matters is affirmed with costs to the Merritts and the cause is remanded to the Chancery Court for the collection of costs, enforcement of the judgment, and any further necessary proceedings.

CANTRELL and CONNER, JJ., concur.