# IN THE COURT OF APPEALS OF TENNESSEE
# AT NASHVILLE
April 4, 2006 Session

## HARDING ACADEMY v. METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, ET AL.

### Appeal from the Chancery Court for Davidson County
### No. 03-2735-IV     Richard Dinkins, Chancellor

---

### No. M2005-01740-COA-R3-CV - Filed on May 22, 2006

---

The Zoning Administrator of the Metropolitan Codes Department of Nashville and Davidson County issued a permit to an elementary school to create a park on property adjacent to the school campus. The local neighborhood association appealed the issuance of the permit to the Metropolitan Board of Zoning Appeals. The Board revoked the permit on the basis that (1) the property would not remain in its natural state; (2) the school intended to use the property as athletic fields for the physical education of their students; (3) instructional activity is not allowed in a park; and (4) the requested use of the property would more likely be classified as a recreation center. The elementary school filed a common law writ of certiorari in Davidson County Chancery Court appealing the revocation. The chancery court reversed the decision of the Board and reinstated the permit finding that the Board acted arbitrarily, capriciously, illegally, beyond its authority, and without supporting evidence in the record. We affirm the decision of the chancery court in all respects.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court is Affirmed

WILLIAM B. CAIN, J., delivered the opinion of the court, in which WILLIAM C. KOCH, JR., P.J., M.S., and FRANK G. CLEMENT, JR., J., joined.

Leslie S. Newman and Jason D. Holleman, Nashville, Tennessee, for the appellant, Friends of Belle Meade Links, Inc.

J. Brooks Fox and John Kennedy, Nashville, Tennessee, for the appellant, Metropolitan Government, Board of Zoning Appeals.

Robert J. Walker and John L. Farringer, IV, Nashville, Tennessee, for the appellee, Harding Academy.

## OPINION

Harding Academy ("Harding"), a private school serving kindergarten through eighth grade, is located directly beside a neighborhood conservation district known as the Belle Meade Links Triangle. The Belle Meade Links Triangle encompasses eleven contiguous lots located across the street from Harding's campus. In recent years, Harding purchased these lots despite the fact that the lots are residentially-zoned. Since the school is also residentially-zoned, Harding is required under Metropolitan Code Law ("M.C.L.") sections 17.26.040 A.6 and 17.16.140 to petition the Metropolitan Board of Zoning Appeals ("BZA") for a special exception permit in order to expand its use. To obtain the permit, Harding must demonstrate at a public hearing before the BZA that it has met applicable standards including requirements for integrity of adjacent areas, design and architectural compatibility, natural features, historic preservation, traffic impact, and hazard protection. M.C.L. §§ 17.16.140, 17.16.150.

In 1999, Harding petitioned the BZA for a special exception permit in order to expand its school population, develop its campus with additional structures and eliminate existing athletic fields located on the main campus to provide the land necessary to build the additional structures. Although Harding's 1999 application did not address the eleven contiguous lots located across the street from the campus, the site plan attached to the application revealed Harding's intention to develop the lots into athletic fields once the properties were acquired and the plans were approved by the BZA. Harding's 1999 petition was approved and the school's on-campus athletic fields were thereafter eliminated in order to build the additional educational structures.

In March 2003, Harding filed another application for a special exception permit. The application proposed the development of a "recreation center" on the property located across the street from the school campus. Because the development of a recreation center is an expanded use requiring a special exception permit, Harding was required to demonstrate at a public hearing before the BZA that the site plan would conform to the standards provided in Metropolitan Code Law section 17.16.150. However, Harding withdrew the application before the hearing was scheduled.

Later in 2003, Harding filed another application concerning the use of the adjacent residential lots. However this time, Harding petitioned the Zoning Administrator of the Metropolitan Codes Department for a "park" permit. According to Metropolitan Code Law section 17.08.030, park permits are permitted by right on residentially-zoned property. Furthermore, park permits do not require a public hearing before the BZA and impose no restrictions on the site plan other than (1) the park be "1. Open to the public for recreational uses, . . .; (2) predominately kept in a natural state." M.C.L. § 17.04.060. Although the right to a park permit in a residential area is essentially unconditional, the Zoning Administrator refused to issue the permit.

As a result, Harding filed a suit in Davidson County Chancery Court and obtained a mandamus order holding that Harding's property was properly zoned for a park.[1] Following the entry of the order, the Zoning Administrator issued Harding a park permit. However, on May 14, 2003, the Friends of Belle Meade Links, Inc. ("Friends"), a group of property owners located in the

---

[1] The order of the chancery court was entered on June 26, 2003, in case No. 03-1354-II.

Belle Meade Links Triangle who surround Harding's properties, appealed the issuance of the permit to the BZA. Friends were concerned that Harding was using the park permit as a means to expand the school's recreational facilities without submitting to a public hearing and avoiding the applicable site plan standards required when obtaining a special exception permit.

At the August 21, 2003, hearing before the BZA, the Board reversed the decision of the Zoning Administrator and revoked Harding's park permit. The order of the BZA provided:

> This matter came to be heard in public hearing on August 21, 2003, before the Metropolitan Board of Zoning Appeals upon application of the appellant questioning the zoning administrator in his decision that Harding Academy may use certain property for a park.
>
> Based on the entire record as recorded in the audio recording and contained in the file, from all of which the Board finds that:
>
> > (1)  Proper legal and written notice of the public hearing had been complied with as set forth in Section 17.40.720 of the Metropolitan Code.
> > (2)  The appellant sought relief under Section 17.40.180 (A) of the Metropolitan Code.
> > (3)  The appellant DID carry the burden of proof that the Board should overturn the zoning administrator in his decision to classify Harding Academy property as a park for the following reasons, (1) the property would not remain in its natural state, (2) Harding Academy's intended use of the property is for athletic fields for the physical education of its students, (3) instructional activity is not allowed in a park, and (4) the use being requested would more likely be a recreation center instead of a park.

Harding submitted a request for reconsideration, however, the request was denied by the BZA on September 4, 2003.

On September 16, 2003, Harding filed a common law writ of certiorari in Davidson County Chancery Court appealing the BZA's revocation of its park permit. After briefing and a hearing, the court determined on April 21, 2005, that the BZA acted arbitrarily, capriciously, illegally, beyond its authority, and without supporting evidence in the record in revoking the permit. The court then reversed the BZA's decision and reinstated Harding's park permit as issued by the Zoning Administrator. The Metropolitan Government and Friends appeal claiming that the trial court erred in reversing the decision of the BZA and reinstating the permit.

An action by the zoning board is reviewed by common law writ of certiorari because it is administrative rather than legislative in nature. *Weaver v. Knox County Bd. of Zoning Appeals*, 122 S.W.3d 781, 783-84 (Tenn.Ct.App.2003). Review under the common law writ is limited to whether the inferior board or tribunal exceeded its jurisdiction or acted illegally, arbitrarily, or fraudulently. *McCallen v. City of Memphis*, 786 S.W.2d 633, 638 (Tenn.1990). The court does not have the authority to re-weigh the evidence or to substitute its own judgment for that of the board. *Hoover, Inc. v. Metro Bd. Of Zoning Appeals*, 924 S.W.2d 900, 904 (Tenn.Ct.App.1996). However, "if a reviewing court finds that there was no material evidence to support an administrative body's decision, the reviewing court must conclude that the administrative body acted illegally." *Hoover, Inc.*, 924 S.W.2d at 904-05. Because the evidentiary foundation for a local zoning board decision is a question of law, the Court reviews the record *de novo* with no presumption afforded to the board's findings below. *Lafferty v. City of Winchester*, 46 S.W.3d 752, 759 (Tenn.Ct.App.2000).

Appellants first argue that the BZA had the authority under Friends' Item A appeal to evaluate Harding's park permit application and reject it based on the determination that Harding's intended use of the property was better classified as a recreation center rather than as a park. The BZA apparently based their determination on the site plan attached to Harding's 1999 special exception permit application which labeled the property as "future athletic fields" and Harding's withdrawn March 2003 special exception application proposing the development of a recreation center on the property.

Recreation center is defined in the Metropolitan Code as "recreational facilities such as community centers, parks, swimming pools and playing fields that are available to the membership of a club or the general public." M.C.L. § 17.04.060. However, as the Zoning Administrator, Mr. Lon F. West, noted in his June 19, 2003, letter to the members of the BZA, Harding's "current use shows no delineated or proposed athletic fields as was shown on the prior plan submitted and later withdrawn by Harding Academy for a 'recreation center.'" He also noted that the "site plan was submitted showing predominately open space with a walking trail encircling the property." Harding's attorney, Mr. George Dean, described the proposed park at the August 21, 2003, hearing stating, "This is going to be as I represented to the board at the last meeting, a big open field. That's basically all it is. There's a walking trail around it, but that's all it's going to be."

Harding's park permit application failed to identify any buildings, playgrounds, pools, or playing fields from which the BZA could reasonably conclude that a recreation center as defined by the code was planned. We therefore find that the BZA acted arbitrarily and capriciously in revoking Harding's park permit based on the belief that the use request would be more likely classified as a recreation center.

The BZA's decision to revoke Harding's park permit was apparently also based on the concession of Harding's attorney, Mr. Dean, at the August 21, 2003, hearing before the BZA that Harding intended to conduct physical education programs on the property.

Mr. Petrey: Say how they are using. Explain in more detail how Harding will be using it. You say they will be using it for recreational purposes, which is needless to say, a very broad term. Are the children just sent across the street to play recreationally? Will there be any structured programs? What is this going to look like if this works out and you get the demolition permit, the homes are torn down, the walking trails installed? It is now a park. – park. What's it going to look like at 10:00 o'clock on a Wednesday morning on a nice spring day? Is the fourth grade class going to be having soccer practice over there, of the – the – or is it going to be just unorganized and somewhat unsupervised recreation? What with do you mean recreation?

Mr. Dean: I'd say both. I'd say they'd have the fourth grade class playing soccer. And I'd say they'd have unorganized kids over playing. And I'd also say – no playground equipment. There won't be anything like that. And I'd say also there'd be people from the community walking around the – the – track, the – the – the walking path. I mean, you got all of that, it seems to me – at least that's the way I would visualize it – much like Elmington Park, which is over close to me on Harding, just off of I-440 there, in front of the West End Junior High.

Chairman Petrey: So there will be organized structured programs of Harding, whether it – it's -

Mr. Dean: Yes.

Chairman Petrey: – it's physical education or – or whatever. There will be --

Mr. Dean: Right.

Chairman Petrey: – organized, structured programs of Harding –

Mr. Dean: Yes, that's true.

According to the BZA, instructional activity is not permitted in a park and therefore, Harding does not qualify for a park permit. Appellants argue that in order for Harding to engage in instructional activity on the property, Harding must instead apply for and secure a special exception permit allowing for the construction of a recreation center.

The applicable definition of park in the Metropolitan Code Law section 17.04.060 states:

"Park" means any facility that is:
1.      Open to the public for recreational uses, including, but not limited to, hiking, swimming, boating, camping;
2.      Predominately kept in a natural state; or

. . .

M.C.L. § 17.04.060.

"The Board of Zoning Appeals has neither the power to zone nor to amend the zoning ordinance. That power is in the county legislative body." *Merritt v. Wilson County Bd. of Zoning*

*Appeals*, 656 S.W.2d 846, 854 (Tenn.Ct.App.1983). Clearly, the definition provided by the code fails to place any limitations or prohibitions on the uses which may occur in a park. The BZA therefore exceeded its authority by imposing upon Harding the additional requirement that only non-instructional activity take place in the park.

The final basis cited by the BZA for overturning the decision of the Zoning Administrator was that Harding's property would not remain in its natural state. Presently, Harding's lots are occupied with houses. However, Harding applied for demolition permits in order to demolish the houses on the property and to maintain the land as a park. The permits were granted on May 6, 2003, but revoked on May 8, 2003, which resulted in a suit challenging the revocation of the demolition permits.[2] There was much confusion at the August 21, 2003, hearing as to what constituted the property's "natural state" as contemplated in the definition of park. The Zoning Administrator, Mr. West, endorsed the position that whether the buildings remained or were demolished was irrelevant to the question of what constituted the natural state of the land. Mr. West argued that as long as the natural features of the property remained, i.e., the trees and grass, then Harding met the requirement of maintaining the facility in a predominately natural state.

> Chairman Petrey: So it's your position that development of houses still is a natural state for that property, and that would qualify as a park?
> . . .
> Mr. West: To – to keep it in a natural state, we – we revoked the tree removal permit. I think Mr. Bernhardt brought that up at – somewhere down the line about to keep it in a natural state they couldn't remove trees. That permit is gone. They have not removed any protected tree, and they don't intend to, as I understand. That's the natural state that – that the definition is contemplating, not houses on it, of course.
> Chairman Petrey: Well, I guess I'm confused then. If the permit is issued and the houses are shown, then you determine that the houses are part of the natural state, which if we accept that, then they demolish the houses, they've changed the natural condition.
> Mr. West: No. No, no. They – they applied for a permit to operate a park. I didn't see that the houses – obviously they would like to tear the houses down. If they get out from under the court order they're going to tear the houses down.
> Chairman Petrey: Well, I'm trying to understand. What's your interpretation of "natural state"?
> Mr. West: Natural state remains – trees – whatever the trees are. I mean, obviously, you can't have much of a park with nine houses.
> Chairman Petrey: Can you have any park with substantial structural development like that? Is that your position? If they don't tear the houses down, have they got a park, period?

---

[2] The Court of Appeals has since determined in its opinion entered on March 14, 2006, No. M2004-02118-COA-R3-CV, that the codes department must re-issue the demolition permits.

Mr. West: Yes.

Chairman Petrey: Okay.

Mr. West: They've still got a park. They've got a permit for a park.

Chairman Petrey: Okay.

Mr. West: But can they use it? I don't know.

Chairman Petrey: No, that's not my question, whether they can use it. It's as it is today, without further change, that's a natural state, by your definition?

Mr. West: It's in a natural state unless they start to cut the trees down.

Chairman Petrey: No, as it – no, as it is today, right at this moment –

Mr. West: It's pretty natural today.

Chairman Petrey: Okay. Well, I understand. That's what I wanted to try to understand. What – what are you relying on here? A site plan with houses or a site plan without houses?

Mr. West: Either one.

Chairman Petrey: Because that's – that's material to me to understand –

Mr. West: Okay. I don't – I don't -

Chairman Petrey: – what the meaning of "natural state" --

Mr. West: – understand where you're coming from. I don't see that it makes a difference. It's the trees that – that became an issue.

Chairman Petrey: Well, I guess that, again, as I think Mr. Shepherd said at the opening bell, you know. The board is the ultimate arbitor [sic] of the interpretation of the zoning code. And this board member, for one, would disagree that having eight or eleven or whatever the number of homes there is a natural state to begin with.

And if that's what they've got, and that's what you've issued the permit on, then, they can't tear them down or else they've changed the natural state, just as much as of they go in and bulldoze the trees, then they bulldoze the houses, they've changed the natural condition.

Mr. West: Well, I don't – I said I based my decision on not removing the trees --

Chairman Petrey: Okay. Well I –

Mr. West: – because that– that's the natural part.

Chairman Petrey: – understand that.

Mr. West: The houses aren't natural.

Chairman Petrey: We understand that now.

Mr. West: If you're going to get technical, houses aren't natural.

"There is a strong presumption of validity favoring the actions of a zoning agency when applying and interpreting its own ordinances, and a reviewing court will defer to a zoning board's interpretation and application of its ordinance, unless such interpretation or application is capricious, arbitrary or discriminatory." 101A C.J.S. *Zoning* § 97 (2005). Despite this presumption of correctness, we believe that the BZA's interpretation of "natural state" was both arbitrary and unreasonable. First Chairman Petrey stated that the property as it presently remains cannot be

considered natural since there are manmade structures, i.e., houses on the land. He then went on to state that Harding is prohibited from removing the houses because it would alter the natural state, that is, the land as it presently remains with the houses intact.

"While the grant or refusal of a permit is within the sound discretion of the board or official authorized to issue it, such discretion must be exercised reasonably, and if an applicant meets all of the requirements of the zoning regulations and there is no valid ground for denial of the application, the permit should be issued." 101A C.J.S. *Zoning* § 259 (2005). In this case, the Metropolitan Code Law section 17.08.030 provides that park permits are issued by right in residential areas.

We believe that it is abundantly clear from the record that the BZA revoked Harding's park permit due to the objections of adjacent property owners who were concerned that Harding planned to use the park for interscholastic competition. However, it is well settled that "the mere complaints and fears of neighboring property owners do not provide the material evidence necessary to support a board's denial of an otherwise proper request." *Lafferty*, 46 S.W.3d at 759. Furthermore, Harding's attorney, Mr. Dean, conceded that in order for Harding to engage in such a use, Harding must return to the BZA and obtain a special exception permit.

> Mr. Dean: My understanding of Mr. West's requirements and the code – the way he interprets the code, no interscholastic competition. And – and I said this last time to the board – and I'm – I'm not trying to fool anybody – I said this to the board last time: Eventually, we intend to come back. We will be back on a special exception, because eventually they would like to have interscholastic competition out on those fields. As we understand it, you cannot do that with a park. But eventually they intend to come back and ask the board to consider that. They will be back for that purpose.

Finally, as BZA member, Mr. Price, discussed at the August 21, 2003, hearing, the BZA must consider permit applications based on the facts before them. Any uses outside the scope of the park permit which Harding may engage in after the permit is issued will become a matter of enforcement rather than an initial consideration in whether or not to issue the permit.

> Mr. Price: They came and applied for a park permit. They said, "This is what we intend to do. We're going to tear down the houses, that's our intent, leave it in its natural state," which is the trees and whatever, natural grass or whatever is there. And I think they are entitled to do that.
>
> Now, the question of are they going to bring kids over there and how all that's going to shake out, you know, that's an enforcement issue, to me, about whether they're – you know, like in Metro, you can't drink beer in a park, and people enforce that. That's illegal. That is enforced. Now, if they have organized activities, and if

you want to get into that discussion, and people want to try and enforce – stop them from doing those type of things, I think that's an enforcement issue.

. . .

There is something that exists for – for accessory uses, if you want to call it that. But at the same time, that's not what they applied for. That's the question we're considering, is – is, you know, Mr. West's decision, upholding his decision. It's not a question of what they may have applied for in the past, it's what did they come down here for now, and do they meet the definition for that? And I think they do.

Chairman Petrey: I would agree with you, but for Mr. Dean's testimony about the structured programs, and I would hate to see this board get into when we know what they're going to do. They're very open about it. I mean, there's – there's no secret here. I mean, I've got to applaud the school for their candor.

Mr. Price: Right.

Chairman Petrey: But why not just – if that's what the plan is, if that's what they want to do, why not let's just get on with it and start having the hearing on what the facts are really going to be in the future, what they really intend to do?

I hate to get us into some sort of an enforcement question...

. . .

Mr. Price: But Clay, I mean, unfortunately for us, at least in my view, that – that's not dictated by us. That's dictated by what comes before us. And unfortunately, the school chose this route.


It is not necessary to determine whether provisions (1) and (2) of M.C.L. section 17-04-060 defining qualification for a "park" are conjunctive or disjunctive. *See State v. Cleveland*, 2005 WL 1707975, W2004-02892-CCA-R3-CD (Tenn.Crim.App.2005); *Town of West Hartford v. Thomas D. Faulkener Co.*, 10 A.2d 592 (Conn.1940); *Wilmington Sav. Fund Soc., FSB v. Chillibilly's, Inc.*, 2005 WL 1654028, No. Civ.A.03C-11-021THG (Del.Super.2005). The record in this case establishes both natural state and use by the public.


Four reasons were given by BZA for overturning the park permit issued by the Zoning Administrator. The first reason was that "the property would not remain in its natural state." There is no evidence in the record to support this statement unless one assumes that dilapidated houses, unoccupied and unused, are the natural state of property. The second reason stated is "Harding Academy's intended use of the property is for athletic fields for the physical education of its students." There is no evidence in the record to support this statement except certain documents appended to the previously withdrawn application of Harding to establish a recreation center. The third basis is "instructional activity is not allowed in a park." No evidence in the record supports this assertion. The last reason is "the use being requested would more likely be a recreation center

instead of a park." The application before the Board was for a park permit. The opinion of the BZA that Harding would be better advised to pursue again its efforts to establish a recreation center provides no basis for rejecting an application for a park permit.

The application before the Zoning Administrator and the BZA is an application for a park permit, not a continuation of the previous application for a special exception permit in order to develop a recreation center. As insisted by the Zoning Administrator and by Harding, all requirements for the issuance of a park permit had been met. The BZA had no authority to reject the application because of a perception that Harding might in the future embark upon activities in excess of those activities that are allowed by the zoning ordinance. Ample means exist for zoning authorities to enforce the ordinance to the end that future activities conform to such activities as are allowed in a park.

Under principles established in *Merritt v. Wilson County Board of Zoning Appeals*, 656 S.W.2d 846 (Tenn.Ct.App.1983) and *Father Ryan High School v. Oak Hill*, 774 S.W.2d 184 (Tenn.Ct.App.1988), the actions of the BZA in this case were in excess of its authority, arbitrary and unreasonable.

Judgment of the trial court is in all respects affirmed, and the case remanded for such further proceedings as may be necessary. Costs are assessed to Appellants.

_____
WILLIAM B. CAIN, JUDGE